## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

BEVERLY R. MAXWELL,

                    Plaintiff,

v.

HOWMEDICA OSTEONICS CORP. and
STRYKER CORPORATION,

                    Defendants.

Civil Action No.: 5:07-cv-1062 (GTS)(DEP)

**SUPPLEMENTAL DECLARATION OF
KIM M. CATULLO**

**KIM M. CATULLO**, an attorney duly admitted to practice before the United States District Court for the Northern District of New York, declares as follows:

     1.     I am a member of Gibbons P.C., attorneys for Defendant Howmedica Osteonics Corp. ("HOC" or "Defendant") in the captioned action. As such, I am fully familiar with the facts and circumstances set forth below.

     2.     Attached hereto as Exhibit A is a true and correct copy of select pages from the transcript of Plaintiff's deposition.

     3.     Attached hereto as Exhibit B is a true and correct copy of select pages from the transcript of Therese Stevens' deposition.

     4.     Attached hereto as Exhibit C is a true and correct copy of Exhibit 2 from the deposition of Therese Stevens.

     Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on September 18, 2009.

                          /s/ Kim M. Catullo
                          Kim M. Catullo

# EXHIBIT A

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
BEVERLY R. MAXWELL,

          Plaintiff,

vs.                              Civil Action No.: 5:07-CV-1062

HOWMEDICA OSTEONICS CORP.,
STRYKER ORTHOPEDICS and STRYKER
CORPORATION,

          Defendant.
-------------------------------------------x

Deposition of BEVERLY R. MAXWELL, held on June 30, 2009,

at the Shanley Law Offices, 283 West Second Street, Oswego,

New York, before Jane K. Zappala, Registered Professional

Reporter and Notary Public in and for the State of New York.

A P P E A R A N C E S

For Plaintiff:    SHANLEY LAW OFFICES
                Attorneys at Law
                283 West Second Street
                Oswego, New York  13126
                  BY:  P. MICHAEL SHANLEY, ESQ.

For Defendants:    GIBBONS, P.C.
                Attorneys at Law
                One Pennsylvania Plaza
                37th Floor
                New York, New York  10119-3701
                  BY:  KIM M. CATULLO, ESQ.

Also Present:    Adriana Agnihotri

Jane K. Zappala, Registered Professional Reporter
          (315)461.9064

80
MAXWELL - CATULLO

1    A  I think he just said Howmedica rep.

2    Q  What had you told Dr. Mahon and Theresa that

3 lead him to say that?

4    A  I told them that I knew I was allergic to

5 nickle because I can't wear cheap jewelry.

6    Q  Why would you bring up nickel at that point?

7    A  Because everybody knows that the most reactive

8 people are is to nickel.  I mean, it's pretty common

9 knowledge, cheap jewelry and nickel.

10    Q  Okay.  But at that point you're sitting there

11 and you're having a discussion with them about what?

12    A  About the knee itself, what it's made out of.

13 He's showing me a knee device and explaining to me how it

14 operates and the different pieces to it.  And I'm holding it

15 in my hands.  And I notice, well, it's made out of metal, so

16 I wonder what kinds of metal, so I asked him.

17    Q  Okay.  So at that point he has a model in his

18 office that he's showing you so that you can get acquainted

19 with what you're about to receive and you say what to him?

20    A  Yeah.

21    Q  What do you say?

22    A  I ask him what kind of metal is this made out

23 of.  He said titanium.  And then I asked does it have any

24 nickel in it because I'm allergic to cheap jewelry.

25    Q  What did he say?

81
MAXWELL - CATULLO

1    A   Him and Terese both laughed and said well, he

2  said -- Terese and him both laughed, but then he's the one

3  that said I'm sure it's made better than cheap jewelry.  And

4  then I felt stupid for asking because it's a medical device.

5  And I said well, I just had to ask, you know.  He said you

6  made a good point, and we'll check into it.  So he told

7  Terese to go call the rep and check and make sure that it was

8  just titanium because that was his understanding it was pure

9  titanium.

10    Q   And how long was she out of the room?

11    A   Just a few minutes and she came back and got

12  him and told him that whoever they had reached was on the

13  phone.  So he left with her to speak with him.  And he came

14  back and confirmed, yes, it's just pure titanium.

15    Q   And what did you say at that point?

16    A   I said okay then, sorry I asked.  I mean ...

17    Q   To date do you know who the person was that

18  they spoke to?

19    A   No, I don't.

20    Q   Did you ever ask them?

21    A   Nope, I never have.

22    Q   Now that you've come to know that these

23  devices actually come in different types of metals, have you

24  had any conversations with Dr. Mahon or Theresa about that?

25    A   Yes, when I went back after I had the allergic

# EXHIBIT B

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF NEW YORK
2  ─────────────────────────────────────────────────────
3  BEVERLY R. MAXWELL,
                              Plaintiff,
4     -vs-                    Civic Action No.:
                              5:07-cv-1062
5  HOWMEDICA OSTEONICS CORP. and
   STRYKER CORPORATION,
6                              Defendants.
7  ─────────────────────────────────────────────────────
8         Examination Before Trial of **Therese Stevens**,
9      held on August 13, 2009, at the Offices of Dr.
10     William Mahon, 140 West 6th Street, Oswego, New
11     York, before Debra Garrison, Court Reporter
12     and Notary Public in and for the State of New
13     York.

14     APPEARANCES:
15
16     For the Plaintiff:    SHANLEY LAW OFFICES
                             283 West 2nd Street
17                           Oswego, New York 13126
                             BY:  **MICHAEL SHANLEY, ESQ.**
18
19     For the Defendant:    GIBBONS, P.C.
       (Howmedica Osteonics  One Pennsylvania Plaza
20        Corp.)             37th Floor
                             New York, New York 10119-3701
21                           BY: **KIM M. CATULLO, ESQ.**
22
23
24
25                   ORIGINAL

10

1    She had not married at that time.  Did you take any
2    history from her at that visit?
3         A    The patients are asked when they come to the
4    office to fill out a patient information form, and if
5    there are any blanks on the form, then I ask the
6    patients those questions upon entrance to their exam
7    room, and that would have been the only time I would
8    have asked the medical questions above and beyond what
9    they did not answer.
10        Q    Without having the record in front of you,
11   do you recall whether there was any information that
12   fell into that category with Ms. Maxwell during that
13   particular visit in April of 2004?
14        A    I do, specifically.
15        Q    What do you recall?
16        A    That the area where there were a list of
17   medications -- I ask all of our patients if they have
18   any allergies to medication, and that line was not
19   filled in.
20        Q    So what did you do when you saw it was not
21   filled in?
22        A    I asked if there were any allergies, and she
23   said, no, at which time I filled in the letters "NKA,"
24   no known allergies.
25        Q    Prior to that visit had you known Ms.

11

1  Maxwell to have any allergies?

2      A    I can't tell you that because I don't have

3  the record, but we would have had prior patient

4  information forms in the chart.

5      Q    Fair enough.

6           MS. CATULLO:  Can we just mark this as

7           Stevens' 1?

8               (Whereupon Defendant's Exhibit 1 was

9               marked for identification.)

10 BY MS. CATULLO:

11     Q    You may have said this.  I apologize if you

12 did.  When you asked Ms. Maxwell back in April of 2004

13 whether she had any allergies, and she said, no, did

14 you document that?

15     A    I did document it on that line, and any time

16 I make a documentation I put my initial after it.

17     Q    Is it your practice to document the response

18 to a question about allergies?

19     A    Yes.

20     Q    I'm just going to show you what was marked

21 as Defendant's 1 and ask you to take a look at that

22 and tell me if that is the medical profile from the

23 visit on April 28, 2004 with Ms. Maxwell?

24     A    Yes, it is.

25     Q    Okay.  And whose handwriting appears on this

12

1  document?  Is yours on here at all?

2      A    Yes, it is.

3      Q    Where?

4      A    The "NKA" is my only handwriting, and my

5  initials.

6      Q    So the "NKA" next to "Allergies" is your

7  handwriting with your initials?

8      A    Correct.

9      Q    And was that made contemporaneously with

10 your interview with Ms. Maxwell?

11     A    I'm not sure what you mean by that.

12     Q    At the same time?

13     A    Yes.

14     Q    So at the time you asked her the question,

15 and she said, no, you made that notation?

16     A    Correct.

17     Q    Prior to Ms. Maxwell's June 14, 2004 knee

18 replacement did she ever advise you or anyone at Dr.

19 Mahon's office, to your knowledge, of an allergy to

20 nickel?

21     A    Not to my knowledge.  No.

22     Q    I think you said, "no," after that, correct?

23     A    Correct.

24     Q    At any time prior to Ms. Maxwell's June 14,

25 2004 surgery did she advise you or anyone at Dr.

13

1   Mahon's office, to your knowledge, of an allergy to
2   metal of any type?
3       A    No.
4       Q    And at any time prior to the June 14, 2004
5   surgery did Ms. Maxwell advise you or anyone, to your
6   knowledge, from Dr. Mahon's office of an allergy to
7   jewelry?
8       A    No.
9       Q    If she had, in fact, advised you of any of
10  those allergies, would you have made a notation of
11  that?
12      A    Absolutely.
13      Q    And would you have brought an allergy of
14  that type to Dr. Mahon's attention?
15      A    Absolutely.
16      Q    At any time subsequent to Ms. Maxwell's
17  surgery in June of 2004 did you ever learn of any type
18  of an allergic reaction that she had?
19      A    Subsequently, meaning after?
20      Q    Yes.
21      A    Yes.
22      Q    When did you learn of that?
23      A    In January of the following year.
24      Q    So January of 2005?
25      A    Yes.

14

1       Q       How did you learn of that?

2       A       The patient presented to the office with a

3    concern of a rash.

4       Q       And did you speak to her at that time?

5       A       I did.

6       Q       And what do you recall of that discussion?

7       A       I recall that she stated she had a rash

8    around the surgical site, and, also, she asked me to

9    look at it, and I did.  She said that she was under

10   the care of her primary care doctor for a possible

11   reaction to something to do with the surgery.

12      Q       Did she indicate that it was a reaction to

13   metal, nickel, or anything like that?

14      A       No.  She simply said she had the rash and

15   that her primary -- she had been to see her primary

16   care doctor and that they would be doing some testing.

17      Q       At any point in time did you ask her if she

18   had any allergy to metal?

19      A       Yes, I did.

20      Q       What did you say?

21      A       The rash seemed to be in the general area of

22   the incision, and, to the best of my knowledge, I

23   remember asking her if she had ever had any problems

24   or allergy to metal, and first she said, no, and,

25   then, she said she had trouble wearing jewelry when

16

1    Q    Okay.  And did you make that at the time
2    that you had the discussion --
3    A    Absolutely.
4    Q    -- or close in time to that?
5    A    Absolutely.
6    Q    Same day?
7    A    Yes.
8              MR. GANOTIS:  You're doing what Kim
9         told you most witnesses do.  You're
10        anticipating the end of her question and
11        speaking real quickly.  Just take your time.
12             (Whereupon Defendant's Exhibit 2 was
13               marked for identification.)
14   BY MS. CATULLO:
15   Q    I'm just going to show you what's been
16   marked as Exhibit Defendant's 2 and ask you if you can
17   take a look at that, and, also, if you recognize it,
18   which I believe you will because I believe this is the
19   message note that you mentioned before.  If you can
20   read it into the record for us, please.
21   A    First of all, it's dated January 17th, '05.
22   "Beverly Ferguson called.  She has rash around
23   surgical knee.  Has had since OR.  She will call Dr.
24   Morgan for dermatology consult.  She has tried many
25   over-the-counter meds.  Not helping.  FYI."

17

1   Basically, means for your information.

2       Q    And this note that you made on January 17,

3   2005 reflects the conversation that you told us about,

4   correct?

5       A    Correct.

6       Q    And that was the first time that you had

7   learned of this rash that existed?

8       A    Correct.

9       Q    Okay.  And was that also the first time that

10  you learned that Ms. Maxwell thought she might have

11  some sort of an allergic reaction?

12      A    Correct.

13      Q    Okay.  And I just want to be clear.  You are

14  certain that prior to the knee replacement surgery Ms.

15  Maxwell did not disclose to you any allergies to

16  nickel, metal, or jewelry, correct?

17      A    I am sure.

18      Q    Thank you.  I have no further questions.

19               MR. SHANLEY:  Nothing here.

20               MR. GANOTIS:  You're all set, Therese.

21               (Deposition ended at 1:23 p.m.)

22

23       *                    *                    *

24

25

# EXHIBIT C

DeMahon, **ZYVOX** 1-17-05
linezolid IV/Oral

Beverly Ferguson called. She
has a rash around surgical
knee. Has had it since OR.
She will call Dr. Morgan for
Dermatology Consult -
She has tried many over the
counter meds -
not helping

X



EXHIBIT
Defendants
2
8-13-09